51 A.3d 708

**Hector BUTLER, Jr.**

v.

**S & S PARTNERSHIP, et al.**

No. 214, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Aug. 31, 2012.

Brian S. Brown (Saul E. Kerpelman & Associates, PA, on the brief), Baltimore, MD, for Appellant.

Frank Daily, Hunt Valley, MD, William C. Parler, Towson, MD, and Thomas Whiteford, Baltimore, MD (S. Todd Willson, Christopher M. McNally, Sarah B. Sherman, Bodie, Dolina, Hobbs, Friddell & Grenzer, PC, Towson, MD, Sean P. Edward, Law Offices of Frank F. Daily, Hunt Valley, MD, Christopher C. Jeffries, David M. Stevens, Whiteford, Taylor & Preston LLP, Baltimore, MD, Parler & Wobber, LLP, Towson, MD), on the briefs, for Appellee.

Panel: MATRICCIANI, BERGER and JAMES R. EYLER (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

On October 9, 2007,[1] Hector Butler, Jr., appellant, by his mother, Yvonne Crosby ("Crosby"), brought suit in the Circuit Court for Baltimore City, against S & S General Partnership ("S & S G.P."), Lee Shpritz ("Shpritz"), Barbara Benjamin ("Benjamin"),[2] S & S Partnership ("S & S"), Stanley and Rhoda Rochkind (the "Rochkinds"), N.B.S., Inc. ("N.B.S."), Dear Management & Construction Co., Inc. ("Dear Management"),[3] and Charles Runkles ("Runkles"),[4] (collectively, "ap-

---

1. Docketed October 18, 2007.

2. Benjamin filed a brief in this Court, but was dismissed prior to oral argument. Although Benjamin is no longer a party on this appeal, we shall nevertheless discuss portions of any motions or arguments with which she was involved below, when it is relevant to our disposition.

3. The record reflects that final judgment was entered as to Dear Management, which entity managed the Bryant Avenue property, and Runkles, who was a property manager for ABC Management, Inc., which entity managed properties for S & S Business Trust, following

pellees"),[5] alleging injuries and damages resulting from lead paint exposure at two residential properties, 2238 Linden Avenue ("Linden Avenue") and 2308 Bryant Avenue ("Bryant Avenue") in Baltimore City, which properties were owned, operated, controlled and/or managed by appellees, either individually or in their capacity as agents/employees. Subsequently, appellees filed answers to the complaint, and discovery ensued. At the conclusion of discovery, each appellee, either individually or together, filed dispositive and/or discovery and/or scheduling order motions, raising several issues, including, *inter alia,* lack of ownership of the properties and/or lack of the presence of lead-based paint during the relevant time periods; lack of evidence of flaking, chipping, or peeling paint to support a Consumer Protection Act ("CPA") claim; that the affidavit of appellant's expert witness, Howard M. Klein, M.D. ("Dr. Klein"), should be stricken, as there was no factual basis to support his proffered opinion; that capillector screening tests [6] for appellant's blood lead level related to Bryant Avenue should be stricken; and, that reports prepared by Arc Environmental, Inc. ("Arc"), which conducted tests to determine the presence of lead at each property, were not in compliance with the court's scheduling order and, thus, should be stricken. After a hearing on the motions on November 9, 2009, followed by subsequent additional motions and rulings, the court refused to strike the screening tests but ruled in favor of appellees on the other issues, including striking the Arc reports with respect to both properties, as appellant did

the court's March 10, 2011 grant of summary judgment in favor of the Rochkinds, N.B.S., Dear Management, and Runkles; however, neither Dear Management nor Runkles filed a brief on appeal to this Court.

4. *See* n. 3, *supra.*

5. *See* nn. 2–4, *supra.* The complaint also listed David Erbe as a defendant, although he did not appear below or on appeal. Following oral argument in this Court, appellant's counsel informed the Court that Mr. Erbe had never been served with process; thus, there was a final appealable judgment.

6. Capillector tests, also referred to as capillary tests, are described as finger prick tests as distinguished from venous tests.

not comply with the scheduling order. The court also struck the affidavit of Dr. Klein on the ground that it violated the scheduling order and Maryland Rule 2–402. After a final judgment was reached as to all parties, this appeal followed.

On appeal, appellant raises several questions for our review, challenging the court's rulings on the various motions. We shall affirm.

### Factual & Procedural Background

#### A. *Discovery*

Appellant was born on October 11, 1986. From approximately August 7, 1987 through May of 1988, appellant resided with Crosby in a third-floor apartment at Linden Avenue. During the first twelve days of Crosby and appellant's tenancy, S & S G.P. owned the Linden Avenue property. Shpritz was a general partner in S & S G.P. On or about September 18, 1987,[7] S & S G.P. sold the Linden Avenue property to Benjamin.

From approximately May of 1988 to August of 1991, appellant lived with Crosby in a second-floor apartment at Bryant Avenue. S & S owned the Bryant Avenue property from 1978 through 2008. The Rochkinds were partners in S & S. N.B.S., an entity related to S & S, did not own the Bryant Avenue property but, at some point, obtained a two million dollar loan secured by an indemnity deed of trust on the property.

On October 9, 2007, appellant filed a 139–page, multiple-count complaint—including a "Request for Entry Upon Land," for testing of the subject properties within thirty days— against S & S G.P., Shpritz, Benjamin, S & S, the Rochkinds, and N.B.S.,[8] alleging injuries related to lead paint exposure at

---

7. We note that the dates of Crosby's lease agreement and the date of the sale to Benjamin are not consistent throughout the briefs or the extract. Suffice it to say, S & S G.P. owned the Linden Avenue property for approximately the first month of appellant's residency. After S & S G.P. sold the property to Benjamin, S & S G.P. had no further interest in the property.

8. *See* nn. 2–4, *supra.*

both the Bryant and Linden Avenue properties. On November 29, 2007, the court issued a scheduling order. Following joint motions to modify the scheduling order, the court modified the scheduling order on March 19, 2009. The modified scheduling order, which was the order controlling at the time that all of the various motions at issue on this appeal were considered, was entered on April 21, 2009. That scheduling order provided, in relevant part:

2. (a) All discovery including full resolution of all discovery disputes shall be completed no later than *09/09/09*. Expert designations shall include all information specified in Rule 2–402(f)(1)(A) and (B).[9]

(b) Defendant(s) shall respond to all interrogatory requests concerning the findings and opinions of experts, and shall have psychometric testing performed on the minor Plaintff(s) and serve such testing results no later than *08/10/09*.

(c) Defendants who still own a subject property shall allow the Plaintiffs to perform a non-destructive lead test upon the premises within 60 days of a written request

---

**9.** The scheduling order refers to Maryland Rule 2–402(f)(1)(A) and (B), however, the relevant provisions were moved, without change, to Maryland Rule 2–402(g), which is entitled **"Trial preparation—Experts."** That section provides:

(1) Expected to be called at trial.

(A) Generally. A party by interrogatories may require any other party to identify each person, other than a party, whom the other party expects to call as an expert witness at trial; to state the subject matter on which the expert is expected to testify; to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the grounds for each opinion; and to produce any written report made by the expert concerning those findings and opinions. A party also may take the deposition of the expert.

(B) Additional disclosure with respect to experts retained in anticipation of litigation or for trial.

In addition to the discovery permitted under subsection (g)(1)(A) of this Rule, a party by interrogatories may require the other party to summarize the qualifications of a person expected to be called as an expert witness at trial and whose findings and opinions were acquired or obtained in anticipation of litigation or for trial, to produce any available list of publications written by that expert, and to state the terms of the expert's compensation.

provided that the request i[s] made no later than four months prior to the discovery deadline in paragraph 2(a). The defendants shall be permitted to attend the lead test accompanied by a consultant(s) or expert(s).

(d) All depositions of expert witnesses shall be completed no later than *09/09/09.*

3. All dispositive motions shall be filed no later than *10/09/09.*

\* \* \*

During the ensuing discovery, appellant identified 18 experts who he intended to call on his behalf, including Dr. Klein. Specifically, on or about April 28, 2009, in answering an interrogatory propounded by Benjamin, which asked appellant to "[i]dentify . . . all experts you intend to call at trial, setting forth their respective fields of expertise, the opinions to which they will testify and the facts upon which they will base their respective opinions, and attaching to your answers to these interrogatories copies of their reports," appellant disclosed that he intended to call Dr. Klein as an "expert in pediatric lead poisoning," and that Dr. Klein was

expected to testify to the extent and permanency of [appellant's] injuries due to exposure to lead paint. Dr. Klein [would] also testify to the probable source of the lead exposure. Dr. Klein [would] also testify that exposure to lead-based paint at all of the defendants' subject premises, as stated in the [appellant's] complaint, was a substantial factor in the [appellant's] injuries.

Appellant also answered that if Dr. Klein were to write a report, it would be provided to appellees.

In a July 2, 2009 letter to appellees, appellant essentially repeated the same information regarding Dr. Klein that he provided in his answers to interrogatories:

. . . [Appellant] intends to call the following experts at trial: Howard M. Dr. Klein, M.D.: Dr. Klein is an expert in pediatrics and pediatric lead poisoning. The designation in [appellant's] Answers to Interrogatories is specifically incorporated herein. Dr. Klein is expected to testify to the

extent and permanency of the [appellant's] injuries due to exposure to lead-based paint. Dr. Klein will also testify to the probable source of the lead exposure[s]. Dr. Klein will also testify that exposure to lead-based paint at all of the [appellees'] subject premises, as stated in the [appellant's] complaint, was a substantial contributing factor to the [appellant's] injuries. He will also testify concerning the dangers of lead in general.

Specifically, Dr. Klein will opine that the [appellant] was exposed to lead at all of the relevant addresses in this case, including the property owned and/or managed by [appellees]. He is also expected to opine that the exposure took place during relevant time period(s) as alleged in the Complaint. He also is expected to opine that the [appellant's] lead poisoning and resulting learning disabilities, cognitive deficits, and other issues set forth in the psychologist's report, as well as other injuries (including but not limited to permanent brain damage, neurobehavioral deficits, math and reading disabilities, mental anguish, failure to achieve academically, emotional overlay and frustration) were caused by [appellant's] exposure to lead at the [appellees'] properties. He is also expected to opine that [appellant] suffered a loss of IQ points as a result of exposure to lead. He is also expected to opine that all of [appellant's] injuries are permanent and irreversible. He is also expected to testify that [appellee's] exposure to lead at the subject addresses, as alleged in the complaint was a substantial contributing factor to [appellant's] injuries. He will also testify as to the [appellant's] educational and vocational abilities, or lack thereof.

Dr. Klein's opinion is based on his review of the relevant medical, psychological, housing, school and other records as well as any reports generated by any other experts, including the [appellees'] own experts, in this case. It is also based on his review and knowledge of the relevant medical literature. It is also based [on] his review of any discovery conducted in this case or any prior filings in this case.

Finally, it is based on his personal knowledge, training and experience.

All of Dr. Klein's opinions will be made to a reasonable degree of medical probability.

[Appellants] reserve the right to supplement this answer should Dr. Klein develop any additional opinions during the course of this litigation.

If Dr. Klein produces a report, it will be provided. Dr. Klein will be made available for deposition at a mutually convenient time.

\* \* \*

On August 24, 2009, approximately 16 days before the close of discovery, pursuant to the modified scheduling order, appellant had the *exteriors only* of 2308 Bryant Avenue and 2238 Linden Avenue inspected for lead-based paint by Arc. Appellant did not submit a written request to appellees or provide appellees with notice and the opportunity to attend the inspections. A report setting forth the results of the lead-based paint inspection was prepared for each property.

Crosby was deposed on August 26, 2009. With regard to Bryant Avenue, Crosby testified that she occupied the second and third floors of the property. According to Crosby, appellant played either inside the house or at a park across the street, and he never played outside in the front or the rear of the property. She stated that the property had been freshly painted when she moved in, but the paint subsequently began to chip around the baseboards, the doors, and the windowsills.

With regard to Linden Avenue, Crosby testified that she resided on the third floor. When she first moved into the property, it was clean and painted. She did not recall any deteriorated paint in the apartment at the beginning of her tenancy. Over time, however, Crosby noticed chipping paint around the windowsills. Appellant did not play outside at the Linden Avenue property.

Crosby testified that she did not remember observing appellant put paint chips into his mouth. She stated that appellant

was never hospitalized for any lead-related problems, but he was tested for lead two or three times. Appellant's medical records revealed that a capillector test was conducted on June 9, 1988, and capillector tests were conducted on September 7, 1988 and April 4, 1990. The September 7, 1988 capillector test indicated a blood lead level of 26 ug/dL,[10] and the April 4, 1990 capillector test indicated a blood lead level of 24 ug/dL. According to Department of Health & Mental Hygiene ("DHMH") records, a single venipuncture test, taken on November 10, 1987, indicated a blood lead level of 24 ug/dL.

## B. *Motions*

As noted above, at issue on this appeal are the court's rulings on various motions. For ease of reference, at this juncture we shall set forth a table of the relevant motions and the court's baseline rulings on those motions. We will discuss the substance of the motions at issue and the court's specific rulings in depth, *infra.*

| Date | Filing party | Title of Motion | Date of appellant's response | Date of appellees' replies | Ruling/date |
|---|---|---|---|---|---|
| October 7, 2009 | N.B.S. | Amended motion for summary judgment | October 19, 2009 | November 3, 2009 | Granted on November 12, 2009.[11] N.B.S. dismissed from case. |
| October 8, 2009 | Runkles (joined by the Rochkinds, S & S and N.B.S.) | Motion to strike Arc report (Bryant Avenue) | October 28, 2009 | November 2, 2009 | Granted on November 12, 2009 |
| October 13, 2009 | Benjamin | Motion for summary judgment and to disregard Arc report dat- | October 27, 2009 (attaching October 20, 2009 affidavit of Dr. Klein relat- | November 5, 2009 (attaching affidavits of Patrick Connor and | Granted on November 12, 2009 |

---

**10.** Blood lead levels are measured in micrograms per deciliter, which is expressed as mcg/dL or ug/dL. We shall use the latter.

**11.** The court made oral rulings on November 9, 2009, and issued a written order on November 12, 2009.

| | | | ed August 27, 2009 (Linden Avenue) | ing to Linden Avenue) | Michael Spodak, M.D.) |
|---|---|---|---|---|---|
| October 13, 2009 | Shpritz and S & S G.P. | Motion for summary judgment | October 27, 2009 (attaching August 27, 2009 Arc report relating to Linden Avenue and October 20, 2009 affidavit of Dr. Klein relating to Linden Avenue) | November 13, 2009 | Granted on November 12, 2009 |
| October 15, 2009 | Rochkinds | Motion for summary judgment | October 28, 2009 | November 10, 2009 | Denied as to negligence, otherwise granted on November 12, 2009 [12] |
| October 15, 2009 | S & S and N.B.S. (joined by the Rochkinds on or about October 30, 2009) | Motion to exclude the testimony of Dr. Klein, appellant's capillector screening tests in connection with Bryant Avenue, the August 24, 2009 Arc report in connection with Bryant Avenue, and for summary judgment | October 28, 2009 (attaching October 26, 2009 affidavit of Dr. Klein relating to Bryant Avenue) | November 9, 2009 | Granted, on November 12, 2009, as to Dr. Klein's affidavit and the August 24, 2009 Arc report relating to Bryant Avenue. Summary judgment motion denied without prejudice to renew motion in limine or for judg- |

**12.** With respect to this motion, the Rochkinds point out in their brief that they did not move on the negligence claim, but raised the issues "concerning Dear Management," i.e., "whether the corporate veil of Dear Management could be pierced to hold [the Rochkinds," who were neither officers, directors or shareholders of Dear Management, liable for Dear Management's actions." The Rochkinds note that appellant is not appealing the court's order as it relates to those issues; rather, appellant is appealing the court's granting of summary judgment as to the negligence claim. We need not set forth the contents of the Rochkinds' motion for summary judgment, or appellant's responses, as they relate to piercing the corporate veil.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | ment as to capillector testing. |
| October 15, 2009 | S & S and N.B.S. (joined by the Rochkinds on or about October 30, 2009) | Motion for partial summary judgment | October 29, 2009 | None | Granted on November 12, 2009 |
| November 20, 2009 | Rochkinds | Motion for reconsideration | December 15, 2009 (consolidated response to appellee's motions for reconsideration and countermotion for reconsideration) | None | Denied on December 28, 2009, without prejudice to pursue a motion for summary judgment or motion in limine to challenge evidence supporting any claim in negligence. |
| November 23, 2009 | S & S | Motion for reconsideration of S & S's motion for summary judgment | December 15, 2009 (consolidated response to appellee's motions for reconsideration and countermotion for reconsideration) | December 17, 2009 (S & S's reply to appellant's response consolidated response to appellee's motions for reconsideration and opposition to appellant's motion for reconsideration) | Granted on December 28, 2009 (docketed January 26, 2010). Appellant's motion for reconsideration denied. |
| February 1, 2010 | Rochkinds | Motion for summary judgment | March 8, 2010 | March 11, 2010 | Denied on March 22, 2010 |
| October 19, 2010 | Rochkinds | Motion in limine to exclude appellant from suggesting or arguing that lead based paint was present at any location in 2308 | None | None | None |

| | | | | | |
|---|---|---|---|---|---|
| | Bryant Avenue and to (1) exclude the Arc report for Bryant Avenue and (2) exclude any testimony or opinion of Dr. Klein | | | | |
| February 11, 2011 | Rochkinds (joined by N.B.S., Dear Management, and Runkles) | Motion for summary judgment | March 3, 2011 | None | Granted on April 1, 2011 (final judgment as to all parties) |

The substance of the motions, in relevant part, follows.

N.B.S. asserted in its amended motion for summary judgment that S & S owned Bryant Avenue during all relevant time periods, and that N.B.S. had no involvement with the ownership, management or maintenance of the property at any time; thus, N.B.S. could not be held liable for negligence or for any violations of the CPA with respect to Bryant Avenue. Attached to N.B.S.'s amended motion was an affidavit of Stanley Rochkind, who swore that N.B.S. had no ownership, management or control of Bryant Avenue. In response, appellant argued that in 1985, N.B.S. borrowed $2,600,000 from Suburban Bank and that S & S guaranteed the loan and secured its guaranty obligation by an indemnity deed of trust on property owned by S & S, including the Bryant Avenue property. Thus, according to appellant, N.B.S. had an "ownership interest" in Bryant Avenue, pursuant to the definition of "owner" in the Baltimore City Housing Code, making summary judgment inappropriate. Appellant also asserted that in light of N.B.S.'s amended motion for summary judgment, it had become necessary to depose Stanley Rochkind, pursuant to Rule 2–501(d)—after the close of discovery—as a deposition was

> necessary to obtain certain information concerning: (a)[ ] the extent of . . . Stanley Rochkind's involvement with . . . N.B.S. . . . and S & S . . ., details surrounding the Indemnity Deed of Trust, and all the [appellees'] relationship with

the subject property 2308 Bryant Avenue [and] (b)[ ] Any other information relevant to issues raised in the [N.B.S.'s] motion.

Runkles, joined by the Rochkinds, N.B.S. and S & S, moved to strike the Arc report related to Bryant Avenue, asserting that on August 24, 2009, an employee of Arc conducted a lead paint survey on the premises of Bryant Avenue, but that appellant did not submit "any written request to the owner or manager of the property prior to having Arc conduct the lead paint survey," and failed "in all respects to comply with the requirements of the [s]cheduling [o]rder," [13] which order required:

> (c) Defendants who still own a subject property shall allow the Plaintiffs to perform a non-destructive lead test upon the premises within 60 days of a written request provided that the request i[s] made no later than four months prior to the discovery deadline in paragraph 2(a). The defendants shall be permitted to attend the lead test accompanied by a consultant(s) or expert(s).

Appellant responded that the lead inspection was conducted prior to the conclusion of discovery and that the "current title owner" of Bryant Avenue was "S & S Business Trust," which entity was not a defendant in the matter. Appellant asserted that the lead inspection in "no manner violate[d]" the scheduling order because

> Paragraph 2(c) relates to the rules for filing Motions to Enter Upon Land to defendants who still hold title to a subject property, and does not apply to properties owned by non parties. No language in the [s]cheduling [o]rder precludes a plaintiff from obtaining a lead inspection of a non party property as long as the inspection was conducted within the discovery timeframe.

---

13. In their lines adopting Runkles' motion to strike, the Rochkinds, S & S and N.B.S. asserted that the Arc report was not produced in accordance with the scheduling order. They otherwise adopted and incorporated Runkles' arguments.

Furthermore, appellant asserted that he did file written motions to enter upon the property along with the filing of his complaint. Appellant requested that the court deny the motion to strike.

Runkles asserted in his reply to appellant's opposition to Runkles' motion to strike the Arc report that appellant's arguments were contradictory in that in one vein appellant argued that he did serve S & S with notice of the testing pursuant to his motion to enter upon the property filed with the original complaint, and in another vein appellant argued that the inspection was valid because the current owner, S & S Business Trust, was "not the original Defendant upon whom Plaintiff claims service of its Motion to Enter Upon the Property," and consequently, appellant was not bound by the requirements of the scheduling order.

Benjamin asserted in her motion for summary judgment that, with respect to the CPA claim against her, Crosby and appellant moved into Linden Avenue prior to Benjamin's ownership of the property; thus, it would have been impossible for Benjamin to have made any misrepresentations about the condition of the property at the inception of the lease. Benjamin further asserted that there was no evidence, aside from a single blood lead level of 24 ug/dL, reported on November 20, 1987, that remotely suggested the presence of a lead hazard at Linden Avenue. Benjamin also asserted that the Arc report was based on a test that was completed without Benjamin's knowledge and without an inspector present on her behalf, in contravention of the scheduling order; thus, the results of that inspection could not be considered as evidence in the case.

In his response to Benjamin's motion,[14] appellant attached Dr. Klein's affidavit, dated October 20, 2009, which appellant alleged contained a "sufficient factual basis to conclude that

---

14. *See* n. 2, *supra.* Appellant also attached the October 20, 2009 Dr. Klein affidavit to his response to S & S G.P. and Shpritz's motion for summary judgment. We shall set forth the contents of the affidavit as it relates to Linden Avenue only once.

[appellant] was exposed to lead and injured at 2238 Linden Avenue." The affidavit provided, *inter alia:*

6. It is my opinion within a reasonable degree of medical probability that the premises 2238 Linden Avenue, Apt. # 3 contained lead-based paint during the entire time period [appellant] resided [there] in 1987. I base this opinion on interrogatory, deposition testimony and Baltimore City Department of Public Works property card stating that the property was an old house built in 1921, in poor· condition with flaking paint from the inception of the lease on the windows, sills, baseboards, doors, bathroom walls and bedroom walls, Baltimore City Health Department records showing that the home contained lead in 1977, and evidence that the exterior of the property was inspected for lead by Arc Environmental, Inc. in 2009 and multiple exterior components were found to be positive including window cases and sills. I also base this opinion on practical experience as a doctor who has treated thousands of children for lead exposure, the fact that lead-based paint was banned in Baltimore City in 1950 and by the federal government in 1978, medical and environmental records and testimony I have reviewed, specific facts as to this instant child's case, as well as medical, scientific, and U.S. Governmental Studies accepted in the scientific community as authoritative....

* * *

7. Based on the information that is now at my disposal, which includes interrogatory and deposition testimony reflecting that the premises 2238 Linden Avenue, Apt. # 3 contained chipping and flaking paint around windows, windowsills, baseboards, doors, bathroom walls and bedroom walls, interrogatory testimony and lease documents establishing that [appellant] resided at ... Linden Avenue ... from August 7, 1987 and continuing through 1987, during tender years ... under the age of six when the property contained deteriorated paint; medical evidence that [appellant] had his first documented elevated blood lead levels on November 10, 1987 of 24 ug/DL only three months after moving into the subject property, it is my opinion to a

reasonable degree of medical probability that [appellant] suffered childhood lead poisoning as a result of ingestion of lead paint at 2238 Linden Avenue, Apt. 3.

8. It is my opinion within a reasonable degree of medical probability that [appellant's] exposure to lead-based paint at the premises 2238 Linden Avenue, Apt. # 3 was a substantial causal factor in his lead poisoning and resulting cognitive injuries, substantial meaning significant as opposed to insignificant.

9. Based on my review of the records in this instant case including medical records that [appellant] suffered an elevated blood lead level of 24 ug/DL on November 10, 1987 and an elevated FEP of 55(wb) on November 10, 1987 while residing at ... Linden Avenue ... at the tender age of 13 months; review of the accepted medical literature and my training and experience in treating childhood lead exposure, it is my further opinion within a reasonable degree of medical probability that [appellant] was exposed to lead based paint during each and every instance that he resided at ... Linden Avenue.... Each and every instance of exposure at ... Linden Avenue ... caused damage to [appellant] at the cellular level substantially contributing to [appellant's] cumulative lead exposure and cognitive injuries. Therefore, it is my opinion within a reasonable degree of medical probability that [appellant] was exposed to lead based paint during the limited time frame of the inception of the lease on August 7, 1987 until September 18, 1987. It is my further opinion within a reasonable degree of medical probability that this limited exposure from August 7, 1987 through September 18, 1987 is a substantial contributing factor to [appellant's] injuries, "substantial" meaning significant as opposed to insignificant.

With respect to the Arc report, appellant asserted that when he served Benjamin with the complaint, he also served her with a "Request for Entry Upon Land," but Benjamin ignored the request, and the lead inspection conducted on August 24, 2009 was obtained during the discovery period.

Appellant did not oppose the entry of summary judgment with respect to the CPA claim.

Benjamin responded, *inter alia*, that neither the 1977 test nor the Arc test performed in 2009 tested the third floor apartment where appellant resided for the presence of lead-based paint, and moreover, the Arc report was obtained in contravention of the scheduling order. Benjamin asserted that Dr. Klein's "blanket statement in his affidavit that because 2238 Linden Avenue was built in 1921, it must therefore contain lead," was nothing more than mere speculation. With regard to appellant's assertion that Benjamin was served with a "Request for Entry Upon Land," Benjamin responded that "at no time whatsoever did [appellant's counsel] ever contact [Benjamin or Benjamin's counsel] to request property testing, arrange for property testing, or file a certificate of good faith effort to resolve a discovery dispute." Rather, appellant retained Arc, who trespassed upon the property and performed testing without Benjamin's knowledge. Benjamin reiterated that because the "testing was performed well beyond the deadlines set forth by [the court] for testing in the scheduling order[,] [t]he report must be stricken (which would leave Dr. Klein without any reliable evidence of lead at 2238 Linden Avenue)."

Benjamin attached to her reply an "Affidavit of Patrick Connor," a certified lead-based paint inspector and risk assessor, and an "Affidavit of Michael Spodak, M.D.," a medical doctor specializing in the diagnosis and treatment of brain-related illnesses and neurocognitive dysfunction," who would opine that there was "no reliable evidence of deteriorated lead-based paint at ... Linden Avenue Apt # 3 during the timeframe of [appellant's] alleged residency."

Shpritz and S & S G.P. asserted in their motion for summary judgment that there was no evidence as to either the presence of lead paint in the Linden Avenue property unit where appellant resided or that exposure to lead paint during the approximately one-month period when S & S G.P. owned the property was a substantial contributing factor to appel-

lant's alleged injuries. According to Shpritz and S & S G.P., Crosby entered into a lease on the property on August 7, 1987, and S & S G.P. sold the property to Benjamin within a month of that date. Appellant's first lead level was drawn on November 10, 1987, nearly two months after S & S sold the property to Benjamin. Moreover, appellees asserted that there was no evidence "demonstrating that there [was] lead-based paint present on the interior of the [p]roperty during the time period that [appellees] were associated with it and when [appellant] resided there." Appellees noted that although there was a lead inspection of the exterior of the property in 2009, there was no evidence to demonstrate that there was lead-based paint in its interior from August 7, 1987 through the time they sold the property to Benjamin. Shpritz and S & S G.P. did not assert that the Arc report violated the scheduling order or that expert designations were inadequate.

Appellant's response to Shpritz and S & S G.P.'s motion was essentially the same as his response to Benjamin's motion, *supra,* including the attachment of Dr. Klein's October 20, 2009 affidavit with respect to Linden Avenue.

N.B.S. and S & S's motion to exclude the testimony of Dr. Klein, appellant's capillector screening tests in connection with Bryant Avenue, and the Arc report, and motion for summary judgment, all joined by the Rochkinds, provided as follows, in relevant part.

Appellees asserted that appellant did not have any medically reliable evidence that he ever had an elevated lead level at the Bryant Avenue property, "as one test proffered by [appellant] fails to indicate a blood lead level for [appellant] at all and the other two tests were capillector screening tests which are regarded by the medical community as unsuitable for diagnostic purposes and prone to contamination." According to appellees, the capillector tests are used by the medical community for screening purposes only and are not a reliable indication of a patient's blood lead level. Rather, blood lead levels are not considered accurate unless derived from a venous blood sample. Thus, appellees asserted that the re-

sults of the capillector tests done on September 7, 1988 and April 4, 1990 should be excluded from evidence and, thus, appellant should be precluded from referencing any of the blood screening tests in connection with Bryant Avenue.

Appellees also asserted that appellant had "failed to produce any evidence of the presence of lead-based paint in the interior of 2308 Bryant Avenue during the time of [appellant's] alleged tenancy as the interior of the property was not tested and the testing of the exterior of the property," which served as the basis for the Arc report, "was done *eighteen years* after the ... alleged tenancy."

With respect to Dr. Klein's testimony, appellees asserted that because capillector tests are unreliable and appellant had not produced any evidence of the existence of lead-based paint in the interior of the Bryant Avenue property during the time of appellant's tenancy, Dr. Klein would have no factual basis on which to establish his opinions on causation. Appellees asserted that Dr. Klein "has no factual basis on which he can conclude (1) that [appellant] had an elevated lead level, and (2) that [appellant] sustained any injuries from an elevated lead level." Thus, in the absence of expert testimony, appellant could not prove his claims. In addition to lead paint related literature and other attachments, appellees appended affidavits by Edward A. Emmett, M.D. and Marianne Schueliein, M.D. to their motion.

In his response to appellees' motion to exclude Dr. Klein's testimony, *et cetera,* appellant asserted that although venous sampling is preferred for confirmation, capillary sampling is an accepted method for blood lead screening. Appellant also pointed to Baltimore City Health Department records, which indicated that Bryant Avenue contained lead in 1979. Appellant asserted that the Arc testing "of the property" in 2009 confirmed those findings. Moreover, with respect to Bryant Avenue and appellees S & S, N.B.S., and the Rochkinds,[15]

---

**15.** *See* n. 2, *supra.*

appellant attached an affidavit by Dr. Klein, dated October 26, 2009, which provided that, *inter alia:*

7. During the 25 plus years I practiced in Baltimore, I saw thousands of children who had been exposed to lead. The vast majority of these children were determined to have lead poisoning because of the results of capillary testing. I saw these children both in my private practice and in my capacity as a faculty member at the University of Maryland School of Medicine. In that capacity, I designed the pediatric curriculum for the Sinai Hospital. That curriculum contained extensive instruction on the area of childhood lead poisoning because Baltimore, Maryland had one of the highest incident rates of childhood lead poisoning in the country.

8. It is incorrect to say that capillary testing is not a reliable method to determine whether a child has lead poisoning. In fact, the exact opposite is true. Based on a review of ... literature which is relied upon and generally accepted in the medical community, capillary testing is [a] widely accepted test used to determine whether a child has been exposed to lead. The tests results contained in [DHMH records] are reliable tests confirming the presence of lead in [appellant's] body. The opinions [contained in expert affidavits from other lead paint lawsuits] to the contrary are incorrect. Contrary to their statements, the capeillector [sic] test is viewed by the medical community as a scientifically reliable test for making a diagnosis regarding the blood-lead level in a patient. In fact, this method was regularly used and accepted in Baltimore during the time period relevant in this case.

9. In this case, the [appellant] had at least three blood tests which indicate that he had an elevated blood-lead level while residing at 2308 Bryant Avenue. The first test (6/9/88) measured what is known as FEP. FEP is not a blood-lead level, but is a measure of other chemicals which show the presence of lead. In this case, [appellant's] FEP was elevated, indicating the possible presence of lead. This is especially true given the fact that a note on the laboratory

report indicates that [appellant's] blood lead (as opposed to FEP) was measured at 20 ug/d[L] when the sample was retested in the [lab]. The second test (9/7/88) showed a blood-lead level of 26 ug/d[L] which even back in 1988 was considered to be elevated. It should be noted that in 1988, the science had not yet fully developed as to the dangers of lead and therefore, FEP and blood-lead levels which today are considered to be extremely elevated were considered to be normal. In fact, since 1991, the level of concern for lead in blood has been 10 ug/d[L]. The third test (4/4/90) sho[w]ed a blood-lead level of 24 ug/d[L] also extremely elevated. Each of these tests shows that [appellant] was exposed to lead.

10. I am able to conclude to a reasonable degree of medical probability, that [appellant] was exposed to lead and injured at 2308 Bryant Avenue because each of these blood-lead levels occurred while he was living there. Further, the property was shown to contain lead through two different sources. First, the Baltimore City Health Department tested the Property for Lead and it was found to be lead-containing (EXHIBIT G). Second [Arc] environmental tested the property for lead and it was found to be lead-containing (EXHIBIT H). The fact that the [Arc] test was performed many years after [appellant] lived at the subject property does not change my opinion because the application of lead-based paint was banned for residential properties in Baltimore City since 1950. Therefore, when taken together with all the other evidence in this case, it is reasonable for me [to] conclude that the lead was present at 2308 Bryant Avenue when [appellant] lived there in 1988. This information, taken with information in Answers to Interrogatories that the property contained chipping and peeling paint, leads me to conclude within a reasonable degree of medical probability that the premises 2308 Bryant Avenue contained lead-based paint during the entire time period [appellant] resided there.

* * *

In response, appellees reasserted that capillector or "finger-stick" tests that have not been confirmed by venous testing are not "an accepted method for the diagnosis of an elevated blood lead level." Appellees also asserted that Bryant Avenue was abated as of July 31, 1979, and appellant failed to provide any evidence of the presence of lead-based paint within the property. Appellees reiterated that nothing in the record suggested that the paint at Bryant Avenue contained lead when appellant lived there, and the Arc test of Bryant Ave—exterior only—was conducted eighteen years after appellant moved from the property. Thus, appellees asserted that without "evidence to establish the presence of deteriorated, peeling or flaking lead-based paint within 2308 Bryant Avenue during the period of [appellant's tenancy], [appellant's] claims must fail as a matter of law.

With regard to the Arc report, appellees asserted that the court should not consider it because it was not supported by an affidavit or other written statement under oath, as is required by Maryland Rule 2–501. Appellees did not make any further arguments with respect to Dr. Klein's testimony, or the affidavit that appellant attached to his response.

In their motion for partial summary judgment, N.B.S. and S & S, joined by the Rochkinds, asserted that there existed no dispute of material fact with regard to appellant's claims that appellees violated the CPA or otherwise engaged in negligent or intentional misrepresentation. Appellees asserted that Crosby's deposition testimony that there was no chipping, peeling, or flaking paint at Bryant Avenue at the inception of her tenancy negated any CPA claim, and appellant's claims of misrepresentation were based on a non-existent agreement.

### C. *Hearing*

On November 9, 2009,[16] the court held a hearing on the various motions. At the hearing, the following transpired, in relevant part.

---

**16.** The transcript incorrectly lists the hearing date as May 29, 2008.

At the start of the hearing, appellant's counsel indicated to the court that he had received "replies to [appellant's] response[s] to the various motions," within "the last two business days." Counsel asserted that "[s]ome of these replies, if not all of them, contain new evidence, new affidavits, new deposition testimony, none of which [appellant] has had the chance under the Maryland Rules—which gives us 15 days if hand-delivered and 18 days if mailed—to review, respond to, and provide a surreply if necessary." According to counsel, the replies were, "in essence, new motions. . . ." On that basis, counsel moved to "strike all the replies and refuse to consider them and the affidavits and deposition testimony and arguments contained therein" or, alternatively, to postpone the matter. The court responded that it would address appellant's concern "as we go through motion by motion . . . [and] we will take that as each motion comes up."

With respect to N.B.S.'s amended motion for summary judgment, which was made on the ground, *inter alia*, that there was no evidence that N.B.S. ever acted as the owner or manager of the Bryant Avenue property, N.B.S. asserted that appellant's argument—that because N.B.S. borrowed $2,600,000 from Suburban Bank and S & S guaranteed the loan and secured its guaranty obligation by an indemnity deed of trust in property owned by S & S, including the Bryant Avenue property—was not "legally enough . . . to confer either ownership or management responsibilities" to N.B.S. under the Baltimore City Housing Code. As a secondary argument, appellant requested that he be permitted to depose Stanley Rochkind on the issue "which was raised for the first time in" the summary judgment motion.

After hearing arguments on the ownership issue, the court ruled as follows:

> [The request to depose Mr. Rochkind] is denied as unnecessary and outside of the discovery period. I cannot find in any of the authorities discussing the definition of "owner" under the Baltimore City Code or on the face of the Baltimore City Code's definition any way in which to rationally hold in N.B.S. as an owner on the property.

The allegations or the assertions in the [appellant's] opposition to the motion that Stanley Rochkind or N.B.S.—and/or N.B.S. and S & S Partnership are so closely related as to hold them in does not seem to be borne out by any of the applicable case authorities.

I am going to grant the amended motion for summary judgment by N.B.S. to dismiss N.B.S. from those counts in which N.B.S. is asserted or alleged to have been an owner in 2308 Bryant at any time between 1978 and January of 2008.

I make no decision as to Stanley Rochkind because the motion was not made on Stanley Rochkind's behalf. My determination is limited to and focused on ... N.B.S., Inc.

\* \* \*

Next, the court heard arguments on Runkles' motion, joined by N.B.S., S & S and the Rochkinds, to strike the Arc report related to Bryant Avenue. Counsel for the Rochkinds argued that while appellant did file a request for entry upon land with the complaint, no testing was completed within 30 days of that request, and in fact was not completed until August 24, 2009. In the interim, S & S sold the property to another entity, which entity did not receive notice of the August 24, 2009 testing. Counsel asserted that the discovery deadline was August 10, 2009, and that appellant tested the property in violation of that deadline. Counsel for S & S argued that S & S did not receive notice of the inspection either.

Appellant's counsel countered that discovery did not conclude until September 9, 2009, not August 10, 2009; thus, the Arc report was received by appellees within the discovery period. The following colloquy then ensued:

THE COURT: Well, when—was anybody at [Arc] designated to testify about this report?

APPELLANT'S COUNSEL: No later than the time the report was provided, which was within the discovery deadline.

THE COURT: The current scheduling order anticipates that all experts were to be designated, including all information under 2–402(g)(1), by what date?

APPELLANT'S COUNSEL: I don't have—that issue not having been raised by any party, Your Honor, I'm not prepared to answer that question.

THE COURT: Well, the [c]ourt's raising that concern, [appellant's counsel]. The interrogatory answers about expert's findings and opinions were to be provided according to the scheduling order no later than August 10th, 2009. When were the parties ever given notice about the factual information, the opinions, the findings that you expect [the expert] to testify about?

APPELLANT'S COUNSEL: I don't know, Your Honor.

THE COURT: All right. You may proceed to respond to the motion.

APPELLANT'S COUNSEL: Your Honor, with regard to each of these [appellees], none of them have standing to raise the issues that they have raised. The issue with regard to notice to the party who owns the property applies when the defendant is still the owner of the property at issue. In this case—

THE COURT: Tell me, what are you relying on?

APPELLANT'S COUNSEL: The scheduling order provision which states that notice must be given to a defendant who is still the owner of the subject property prior to the time the testing is done.

In this case, the current owner of the property is not a defendant to the case. [Counsel for S & S] stood up and said that S & S ... owns the property. That's not correct. SS Business Trust now owns the property at issue in this case. There was no obligation upon [appellant], pursuant to the scheduling order, with regard to this property, to provide notice to any of these [appellees]—

THE COURT: [Appellees] weren't—didn't have a right to accompany the inspection?

APPELLANT'S COUNSEL: Not under the language of the scheduling order. None of them still owned the property, Your Honor, and that's what the—

THE COURT: So why should I—why should I pay attention to the scheduling order language in that narrow frame and ignore the rest of the scheduling order about your obligations under 2–402(g)(1)?

APPELLANT'S COUNSEL: Well, I haven't answered that question, Your Honor. My obligations under 2–402(g)(1) were not raised as a basis of the exclusion, if it even is appropriate, of any testimony from [an expert of] Arc Environmental. So for the [c]ourt, it's not different. The [c]ourt raising this question to me now is no different than getting an affidavit from one of the [appellees] the day before the hearing and expecting me to come in and argue it.

THE COURT: Well, there are a bunch of other motions for summary judgment and/or to exclude [Arc] reports, whether as to Linden or as to Bryant, because of the late disclosure.

APPELLANT'S COUNSEL: And that's a different issue.

THE COURT: So it's relevant. Let me get an answer to my question about why I should view [appellant] as having limitless permission to conduct testing without notifying the [appellees].

APPELLANT'S COUNSEL: Because, simply put, the scheduling order requires notice to be given if a defendant is still the owner of the property. And with regard to this piece of property at issue here, Bryant Avenue, none of the defendants still owned the property. Therefore, [appellant was] not obligated under the scheduling order to provide notice to the [appellees] that the testing was to occur.

When we obtained the test results, we provided them timely to the [appellees] within the scheduling deadline that's set forth in the amended scheduling order.

And just for the record, Your Honor, a motion to enter upon land was filed with the complaint. And at that time, [S & S] still did own the subject property.

* * *

THE COURT: So it's superfluous language that there was an expectation or an instruction that the testing was to be completed not later than four months prior to the close of discovery?

APPELLANT'S COUNSEL: It's not superfluous because it doesn't apply. If any of these defendants still owned the property, you might have a point, but these defendants don't.

THE COURT: Did you ... file an action to the new non-defendant owner looking for access to the property?

* * *

APPELLANT'S COUNSEL: No.

* * *

THE COURT: The inspection took place only as to the exterior of the property?

APPELLANT'S COUNSEL: That's right, Your Honor.

THE COURT: And your expert, Dr. Klein ... is relying in pertinent part on the findings of the exterior?

APPELLANT: And other evidence, Your Honor.

THE COURT: And when was Dr. Klein provided the Bryant property [Arc] report?

APPELLANT'S COUNSEL: On or about the same time the [appellees] were, Your Honor.

* * *

THE COURT: When were [appellees] first given any notice of [appellant's] intention to rely on [the Arc] report?

APPELLANT'S COUNSEL: [I]t wasn't raised [by appellees], there may have been a designation made some time prior to the August 24th report, but no later than their receipt of the August 24th report. I don't know for certain whether a letter or other designation went out concerning [Arc] prior to that time. But, again, it was not raised by them as a basis of their motion.

* * *

After counsel for appellees argued their positions, the court noted that it would take the issue under advisement until hearing the other motions relating to the Arc reports.

The court next heard arguments on Benjamin's motion for summary judgment. Appellant's counsel argued that neither affidavit attached to Benjamin's reply to appellant's response in opposition to Benjamin's motion for summary judgment, i.e., the affidavit of Patrick Connor and the affidavit of Dr. Spodak, had been attached to Benjamin's original motion for summary judgment; thus, appellant asserted that he was deprived of the opportunity to "review these new affidavits, to discuss with his experts whether or not there can be a counter-affidavit filed as if it were an original motion for summary judgment. And the reply itself . . . incorporates the testimony of [Patrick Connor and Dr. Spodak] to bolster [appellee's] arguments." The court responded, "Isn't this a perfect example of how and why there's a problem with the [Arc] test because the [appellees'] experts weren't afforded an opportunity or any advance notice or knowledge about the test?" The following then transpired.

> APPELLANT'S COUNSEL: The [Arc] test is only one of the many pieces of evidence upon which Dr. Klein relies to base his opinion to a reasonable degree of medical probability that the [appellant] was exposed to lead in the [Linden Avenue] property.
>
> * * *
>
> THE COURT: So your hope is that I exclude the reply, and I shouldn't consider the responsive information because, somehow or other, the defendants knew or should have known that Klein was going to rely on the Arc report, and the [appellee's] experts shouldn't have an opportunity to respond to the [Arc] report or the Klein report?
>
> APPELLANT'S COUNSEL: No. What I'm saying, Your Honor, is if the [c]ourt is going to consider the new affidavits, which [appellant] has not seen before [a few days prior], the [c]ourt should treat it as a newly filed motion for summary judgment which, in essence, it is, and allow the

[appellant] the time provided under the Maryland Rule to respond, if they can, with a counter-affidavit or legal arguments which address the new matters that were raised in the [appellee's] reply.

THE COURT: How are they new matters?

APPELLANT'S COUNSEL: They contain affidavits from experts that were not attached to the initial motion for judgment.

THE COURT: What's the earliest that these affidavits could have been generated by the [appellees]?

APPELLANT'S COUNSEL: On or before the summary judgment deadline, Your Honor. These affidavits don't go just to the—

THE COURT: When was Dr. Klein's report or attachment to your opposition to the summary judgment first produced [to appellees]?

APPELLANT'S COUNSEL: I don't know when the report was first produced to the defendants.

* * *

THE COURT: [Addressing Benjamin's counsel] I want to hear first as to whether, why, and how I should receive and review and/or rely on the reply memoranda, especially as it includes an affidavit of Patrick Connor and an affidavit of Michael Spodak.

BENJAMIN'S COUNSEL: Your Honor, first and foremost, the first time that I ever saw Dr. Klein's affidavit was when I received [appellant's] response to our initial summary judgment filing. . . .

* * *

The earliest that I saw it . . . would not have been before October . . . 30th. . . .

* * *

[Appellant's] reply to my motion contained a detailed affidavit from Dr. Klein with information specific to my property, 2238 Linden Avenue, that had never been provided to me in discovery by way of answers to interrogatories, by way of

affidavit, or anything, specifically relying upon the [Arc] . . . report, as well as 1977 testing done on my property to establish that our property was a substantial factor.

\* \* \*

The . . . reply that I filed. . . . I don't like filing these things at the last minute. The problems [sic] was . . . that I only had about five days to get a response to Dr. Klein's affidavit, which raised a whole host of issues that I had never seen. In fairness to [appellant's counsel], I tried to get it to him with ample time Friday and over the weekend to review it. It's not a very long opposition. . . . It merely attempts to point out certain arguments that we have that things that Dr. Klein was relying upon are simply improperly relied upon.

\* \* \*

THE COURT: Am I correct in understanding that you had never received a report from Dr. Klein?

BENJAMIN'S COUNSEL: This is correct. And to date, Your Honor, I don't believe we have received a report.

\* \* \*

THE COURT: All right. And Dr. Klein was identified as an expert at some point by [appellant's counsel]?

BENJAMIN'S COUNSEL: I believe Dr. Klein was . . . designated.

\* \* \*

THE COURT: Did the answers to interrogatories provide any of the detail focused on the Linden Avenue address that appears to be presented in the affidavit that accompanies [appellant's] response to your motion?

BENJAMIN'S COUNSEL: Absolutely not. . . .

THE COURT: All right. I am going to allow the reply to be filed and received, and I will review it in connection with this motion. I will consider in the circumstances whether [appellant's] identify any need to engage in further discovery of Mr. Connor and/or Dr. Spodak, as I also consider whether, when, why, and how the [appellees] may require

further discovery from Dr. Klein, given the late arriving affidavit.

\* \* \*

In her motion for summary judgment, Benjamin also raised the argument that the Arc report pertaining to Linden Avenue should be stricken because it violated the scheduling order. In that regard, Benjamin argued the following, in relevant part.

> BENJAMIN'S COUNSEL: [I]n our original filing we had raised the argument ... that the [Arc] report that was generated as a result of testing done on our property, which we received at or near the same time as the report that was generated for Bryant Avenue, was prepared and was the result of testing that was grossly in contravention of the scheduling order in this case. . . .

> \* \* \*

> And then [after Arc] generated a report, which Dr. Klein then relies upon in rendering opinions about the interior third-floor apartment where [appellant] allegedly lived in this case, which ... based on the arguments we've raised, is preposterous. But setting that to the side ... what we are requesting is simply that the report against Linden Avenue be stricken as we were never contacted.

> \* \* \*

Subsequently, the court heard appellant's arguments regarding Benjamin's "reply," which included the affidavits. The following ensued.

> THE COURT: I need to understand when was the first time the [appellees] were fairly and reasonably apprised of the causation that [appellant's] expected to present in this case?

> APPELLANT'S COUNSEL: [The appellees] did not raise at any time any argument of untimely named experts, insufficient expert designation, or any like argument. What they raised ... is that [appellant's] cannot make their case.

In reply to that, the [appellant's] attached ... among other things, the affidavit of Dr. Klein....

What we have here ... even without the [Arc] report, is sufficient evidence from which a jury could conclude that the [appellant] was exposed to lead and injured at the [appellees'] property.

Even if this [c]ourt were to accept the affidavits of Dr. Spodak and Mr. Connor, without giving the time for [appellant] to reply as required by the Maryland Rules, the worst the [appellant's] position is is that there's a dispute of fact for the jury to decide. Do they accept Dr. Klein's interpretation of the facts, or do they wish to accept Dr. Spodak's and Mr. Connor's interpretation of the facts?

All these affidavits do, if they're accepted over [appellant's] objection, is create a dispute of fact. In reality, prior to the time the [appellees] filed their reply, the [appellant was] in the position where [he] had the evidence, and the [appellees] failed to raise a dispute of fact ... contrary to [that] position.

But ... [w]e are here now with counter-affidavits from opposing experts who have different views of what the evidence says.

The [appellees] have never argued to this [c]ourt any type of deficiencies in any of the designations that were provided to them by way of designations of experts to the [appellant]. They're jumping on the bandwagon now because the [c]ourt raised it sua sponte, but that's not the motion that the [appellant] was put to the test to respond to today.

And in response ... Dr. Klein, based upon his review of the testimony of Ms. Crosby, based upon his review of not just the [Arc] report, but of the earlier lead testing, based upon his review of the age of the property, which, again, was attached as an exhibit, based upon his review of the condition of the property while the [appellant] was living there, based upon his review of the fact that [appellant] had an elevated blood lead level.... [I]t's certainly enough to overcome the [appellees'] motion[s] for summary judgment.

Further ... if the [c]ourt is ... persuaded by [appellee's] affidavits, certainly the [appellant] should have the opportunity to present those affidavits to his own experts and see what, if any, reply there may be. Because all the information upon which the [appellee's] experts rely, every scintilla of it, was in their possession and could have been relied upon by them when they filed their motion for summary judgment in the first place.

\* \* \*

There is no reason why those affidavits could not have been included in their first motion for summary judgment. Then, of course ... [appellant] would have [been] put to the test of having Dr. Klein reply to them then.

\* \* \*

THE COURT: Why ... would you feel compelled to produce the Klein affidavit in response to the motion then?

APPELLANT'S COUNSEL: ... [O]ut of an abundance of caution.

\* \* \*

THE COURT: And when was the first time that the opinions that Dr. Klein gave in that affidavit get disclosed to the [appellees]?

APPELLANT'S COUNSEL: Again, Your Honor, as that issue as to the timeliness of the opinions—his opinions being provided to the [appellees] were not raised by anyone at any time for any reason, I'm not prepared to answer that question. I know I was presented with a motion for summary judgment ... and I replied accordingly.

\* \* \*

THE COURT: And [Benjamin's] Interrogatory Number 6 [asks appellant to identify] experts and set[ ] forth experts' fields of expertise, the opinions to which they will testify, and the facts upon which they will base their respective opinions. And is .... that the opinion and the facts provided as to Dr. Klein's expert testimony that was provided to ... Benjamin?

APPELLANT'S COUNSEL: I don't know if that's the only information. Again, that issue was not raised by the [appellees].

\* \* \*

THE COURT: All right. I'll hear from [Benjamin's counsel]. . . .

\* \* \*

BENJAMIN'S COUNSEL: We have . . . a very general statement of Dr. Klein's opinions and answers to interrogatories. . . .

\* \* \*

I didn't know what Dr. Klein was going to say before he wrote his affidavit, and that is precisely the reason why we felt compelled to respond to it.

\* \* \*

. . . I would also state . . . that when you strip away the information that Dr. Klein relies upon, the [Arc] . . . report, the 1977 testing, what he is left with is pure speculation. . . .

\* \* \*

The court next heard arguments on Shpritz and S & S G.P.'s motion for summary judgment. The court first asked movants' counsel to address whether and why it ought to consider the reply filed by them. The following transpired in that regard.

COUNSEL FOR SHPRITZ AND S & S G.P.: . . . [T]he reply only addresses those arguments set forth in the opposition filed by [appellant].

There has been some questions as to when any of the parties received the more detailed causation evidence from Dr. Klein. And from my clients' standpoint, the first date that we received that level of detail was within the opposition, was contained as an exhibit to the [appellant's] opposition to my clients' motion for summary judgment.

So the reply merely addresses the issues that were set forth in Dr. Klein's affidavit, and merely further supports our motion for summary judgment, but there aren't any new

issues. There is no new deposition or affidavit or anything of that nature.

\* \* \*

... [The reply] was our only ability to respond to the affidavit filed by Dr. Klein.

\* \* \*

And ... as the first more detailed information with regard to [appellant's] causation evidence was received with the opposition, so we now have the [appellant's] answer to interrogatory and then this affidavit from Dr. Klein.

\* \* \*

THE COURT: All right. Given the responsive nature of the reply to the Klein affidavit and the causation assertions by [appellant's] in opposition to the motion for summary judgment by [Shpritz] and S & S [G.P.], I will permit the reply and refer to it as appropriate.

\* \* \*

Counsel for Shpritz and S & S G.P. then proceeded to argue the merits of the motion for summary judgment, asserting as in their written motion, *inter alia*, that there was no evidence that appellant was exposed to lead paint during the "very narrow period of time" that S & S G.P. owned the Linden Avenue property. At the conclusion of counsel's argument, appellant's counsel again suggested to the court that "the issue of disclosure of the experts' opinion and the adequacy of those opinions were not at issue on any of these motions. They were raised because the [appellees] jumped on the [c]ourt's invitation and now started making new arguments concerning those issues. Nothing in any of the pleadings said to the [c]ourt, the [appellant's] designations were insufficient." The court asked, again, when "did Dr. Klein offer any basis for his opinion either as to the Linden or the Bryant ... addresses?" Appellant's counsel responded, "... I'm not prepared to answer that question because it wasn't addressed in the motions."

The court next heard arguments on the Rochkinds' motion for summary judgment, the substance of which is not relevant

here. After hearing arguments, the court granted the motion as to "the claims of negligent misrepresentation, as to the claims of fraud, as to the demand for punitive damages as to the claims under the [CPA], as to vicarious liability and civil conspiracy." The negligence claims as to Dear Management and/or Stanley Rochkind were denied.

The court next heard arguments on the motion by N.B.S. and S & S, joined by the Rochkinds, to exclude the testimony of Dr. Klein, appellant's capillector screening tests in connection with Bryant Avenue, the August 24, 2009 Arc report in connection with Bryant Avenue, and for summary judgment. The court first requested that counsel for N.B.S. and S & S address whether and why the court should consider appellees' reply to appellant's opposition to appellees' motion. In essence, appellees' counsel argued that the court should consider the reply because it addressed and rebutted "unfounded statements in Dr. Klein's affidavit ... which were not contained in [appellant's] designation." Rather, appellant's "designation was a boilerplate listing Dr. Klein, along with about a dozen other experts, indicating that basically this was his field, medical causation, without anything specific related to this case." Counsel argued that Dr. Klein, in his affidavit—which counsel for appellant admitted was first proffered to appellees in appellant's response to appellees' motions for summary judgment—discussed "the capillary tests, which ... he says [are] a sound basis for determining the source of—or the lead level at a particular time." Counsel continued that appellees' reply "rebuts that and at the same time shows ... that all of the medical literature and treatises ... contain statements supporting [the position] ... that without venous testing, a diagnosis of an elevated lead level is not to be made based on capillary testing, unless there's confirmatory venous testing." The court ruled that it would allow appellees' "reply memorandum as it addresses the testing issue that was first described in the motion to exclude the capillary tests in particular, and then squarely put into issue with [appellant's] submission of Dr. Klein's affidavit, dated October the 26th, 2009."

Argument on the merits of the motion then ensued. Appellees argued that the capillector tests should be excluded as unreliable. With regard to the Arc report, appellees argued, *inter alia,* that "in addition to the fact that the report was late [and appellees] didn't get notice ... it [was] completely irrelevant because [Crosby] said [appellant] was never outside ...," and only the outside of the property was tested. Therefore, opined appellees, without that evidence, Dr. Klein had no factual basis for his opinion testimony.

Appellant argued in response, *inter alia,* that appellees N.B.S. and S & S did not have standing to challenge whether the Arc report was in violation of the scheduling order because they were not the "owner[s] of [t]he subject property who would have had a right to be there at that time."

Finally, the court addressed the motion for partial summary judgment on the CPA claims, filed by N.B.S.[17] and S & S, and joined by the Rochkinds. Appellees' counsel argued that Crosby's deposition testimony was that there was no chipping, peeling, or flaking paint at Bryant Avenue at the inception of the tenancy; thus, appellant had no cause of action under the CPA. Appellant's counsel responded that proving that there was chipping, peeling, and flaking paint at the inception of the tenancy is "only [one] way that a plaintiff can prove a" CPA claim, and that in this case, the ground for the CPA claim was a violation of the housing code, i.e., "painting over old paint without properly preparing the surfaces," prior to the inception of the lease.

Following argument on the various motions, the court issued oral rulings from the bench. First, the court granted S & S's motion [18] on the CPA claim, stating that "there is no way that a reasonable person could conclude or infer that there was flaking, chipping, peeling paint at the inception of the lease at Bryant at the relevant time, based on Ms. Crosby's

17. Counsel indicated to the court that "N.B.S.' motion has already been granted."

18. *See* n. 16, *supra.*

testimony." As to the remaining issues, the court's rulings were as follows, in relevant part:

My starting point for explaining my eventual decisions on the pending motions is Maryland Rule 2–402(g)(1)(a), which governs the scope of expert disclosures in response to interrogatories.

The Rule instructs that a party by interrogatories may require any other party to identify each person, other than a party, whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, to state the substance of the findings and the opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, and to produce any written report made by the expert concerning those findings and opinions.

I'd also refer to and rely on Maryland Rule of Evidence 5–702 to help flavor what the disclosures are expected to be since ... the eventual testimony is obliged to address not only the expert's qualifications, but the appropriateness of the testimony and the particular subject, and whether a sufficient factual basis exists to support the expert testimony.

Under the initial scheduling order in this case, which was dated November 29th, 2007, expert designations were to include all information specified in Rule 2–402(f)(1)(a) and (b). And the [appellant was] also obliged to respond to all interrogatory requests concerning expert findings and opinions and to complete and serve their testing results no later than a defined date with close of discovery in anticipation of a trial date at that time on July 9th, 2009.

There was, by motion, subsequent modifications of these dates. The [c]ourt's currently applicable scheduling order, dated April 21st, 2009, has instructed a trial date of January 6, 2010, with close of discovery having already passed on September 9th, 2009. The expert designations were instructed by the revised scheduling order to include all information required by Rule 2–402(g)(1). The interrogato-

ry answers about expert findings and opinions were to be submitted by no later than August the 10th, 2009.

\* \* \*

The information provided in [appellant's] interrogatory responses ... contained only brief boilerplate language regarding the expected testimony of Dr. Klein.

For example, as to Dr. Klein, [appellant's] medical and causation expert, the [appellant] identified him as an expert in pediatric lead poisoning, [stating] ... that he's expected to testify to the extent and permanency of [appellant's] injuries due to exposure to lead paint. He'll also testify as to the probable source of lead exposure. He'll testify that exposure to lead-based paint at all of the [appellees'] subject premises was [a] substantial factor in [his] injuries.

\* \* \*

The [appellant's] letter, dated in July of 2009, supplementing the disclosure and amplifying Dr. Klein's information, was to the same effect.

[Appellant's] responses to interrogatories and the letter did not comply with Rule 2–402(g)(1)(a) or the scheduling order because the information provided was too generic to have any meaning for the [appellees] or as to the properties in this case.

In my view, the [appellant] has failed to satisfy his expert disclosure obligations. The generic answers given in the interrogatory responses and in the supplemental letter do not address any specifics or particulars as to the properties ... at issue in this case on Linden or on Bryant Avenues. There is no reference in those disclosure to the [appellant] by name or to the street addresses of concern.

The first time the ... [appellees] are advised of any particulars of Dr. Klein's opinions is by affidavit in response to the summary judgment motion.

To the same effect, the [Arc] report is disclosed, to be sure, in advance of the discovery deadline, but too late for any of the [appellees] to address the report in any meaningful fashion.

And the instructions, notwithstanding the [appellant's] suggestion that there's a standing dispute as to some of the [appellees] to contest the [Arc] reports, either as to Linden or as to Bryant, the scheduling order is clear enough, and I see no good faith efforts to comply with the ... scheduling orders of this [c]ourt.

The [Arc] reports are going to be excluded as to both Linden Avenue and the Bryant Avenue addresses as too late to do anybody any good, reflecting no good faith compliance with the scheduling order; no notice to the [appellees] to attend, participate, and afford their experts any realistic opportunity to address and respond to the [Arc] reports.

I am going to comment, but do not base my decision in substantial part or even in limited part as to the relevancy of the [Arc] reports, but I do note that both of them relate to the exterior of the premises and raise substantial question in my mind as to the reasonableness of Dr. Klein referring to or relying in any reasonable fashion on those [Arc] reports to provide his report.

The [appellant's] failure to comply with Rule 2–402(g)(1)(a) and the scheduling order is a substantial violation in my view. The scheduling orders and the discovery obligations of the [appellant was] intended and designed to prevent precisely what the [appellant has] done, offering at the 11th hour, long after the close of discovery, and in response to legitimate summary judgment motions, belated opinions from experts that have absolutely and decisively changed the legal landscape of this case.

The failure of the [appellant] to make the disclosures in a timely fashion is substantial in large part because the timing of the Klein report allows for no time for the [appellees] to conduct meaningful discovery, long after the close of discovery, and almost literally on the eve of trial, this being November, with trial scheduled to proceed on January the 6th, 2010.

The description of the scrambling that one of the parties did to secure expert affidavits in response to Dr. Klein's affida-

vit is quite telling. The late production of the Klein report, the affidavit, makes it virtually impossible to secure responsive opinions from defense experts, to take any depositions, even while trial preparations are under way, or to complete those depositions.

Even now, as we understand, the [appellant is] demanding an opportunity to depose experts Spodak and Connor. The expert disclosures made by Dr. Klein did not even implicate the [appellees'] properties until August of 2009. The.... Klein affidavit wasn't dated and produced until October of 2009. The [Arc] reports were dated in August of 2009, and weren't produced for the first time until contemporaneous with those reports.

I agree that it would have been the better practice for [appellees] to file motions for sanctions or to exclude experts or to compel further expert disclosures prior to the scheduled close of discovery and after receiving the generic interrogatory and letter responses as to Dr. Klein.

But the issue did not fully reveal itself until Dr. Klein disclosed the nature and manner in which he was going to rely on the capillary tests; the Health Department materials from 1977 and 1979 as to the Linden and Bryant Avenue properties, respectively; and on the [Arc] reports.

\* \* \*

This is not a case where a postponement of the trial date is a desirable way to cure the prejudice that clearly results and is apparent to the [c]ourt from arguments all day today as to [appellant's] discovery failures. The trial is scheduled to begin in January.

The scheduling order already has been modified to extend the expert disclosure period and the discovery deadlines. The scheduling order that currently applies does instruct that the trial date is firm. It's not going to be modified, absent truly exigent circumstances.

For all of these reasons, the Klein report is excluded and the [Arc] reports as to Linden and Bryant properties expected to be offered by [associates of Arc are] excluded....

The [appellant's] evidence remaining or offered that he was lead poisoned at the Linden Avenue address is the [Arc] report, now rejected. The fact of residency ... at Linden Avenue for several weeks in 1987 as to one owner and then.... September 18th, 1987, as to the new owner[.]

\* \* \*

There was a single blood lead level reading in November of 1987. It is not possible for me to draw any reasonable conclusion that the blood lead level reading of November 1987 relates in any way to the tenancy prior to September 18, 1987. It is conceivable that the blood lead level reading relates to, but it's not reasonably so, to the tenancy beginning on and following after September 18th, 1987.

The [appellant's] evidence that there was lead paint and exposure of [appellant] at the Bryant Avenue address [in October of 1988].

\* \* \*

.... The evidence is the [Arc] report that's now been excluded. The fact of the residency in and following October of 1988, the health report indicating a violation and abatement in 1979, and that's about it.

In the circumstances and because Dr. Klein's report is excluded, I cannot find that the [appellant has] made a prima facie case of causation at the Bryant Avenue house.

I am, however, expressly not making a decision as to the admissibility of the capillary or capillectory test.

\* \* \*

I am granting the motion as to the Klein affidavit, dated in October 2009.

I am granting the motion as to the [Arc] report dealing with Bryant Avenue.

I am denying the exclusion of the capillary tests in 1988 and 1990 with leave for the parties to renew if there's anything left of this case.

\* \* \*

In light of the fact that the Klein affidavit is the principal evidence of causation, and it has been excluded, I am going to grant the motion for summary judgment asserted by the [appellees] S & S Partnership.

As to ... Runkles' motion to strike the [Arc] report as to the Bryant test, I am granting that motion for reasons stated and relying on the arguments also presented by S & S Partnership.

As to ... N.B.S. and S & S Partnership, request for entry on land, I am going to deny that motion both as untimely and moot.

As to ... Benjamin's motion for summary judgment, I already granted the motion to dismiss ... as to the [CPA]. As to ... the negligence count, I am granting that motion in view of my determination to strike or exclude Dr. Klein's affidavit, and my determination to exclude the [Arc] report relating to the Linden ... Avenue exterior.

\* \* \*

.... I will grant the [Shpritz and S & S G.P.] motion for summary judgment ... focusing on the Linden Avenue property.

The absence of ... proof of exposure to lead-based paint for the period of time between August 7th, 1987, and September 18th, 1987, is an additional reason for granting the summary judgment....

\* \* \*

### D. *Written Order*

On November 12, 2009, the court issued its written order. The order provided the following, in relevant part.[19]

For those reasons stated on the record and herein, it is ... hereby

\* \* \*

---

19. We have omitted the court's citations to the record, as well as its footnotes, except where otherwise indicated.

**ORDERED** that the Amended Motion of Defendant N.B.S., Inc. for Summary Judgment, opposed by Plaintiff and the subject of Defendant's Reply, is **GRANTED** and N.B.S., Inc. is **DISMISSED** from this case, and it is further

**ORDERED** that the Motion of Defendant Charles Runkles to Strike [Arc] Report [Bryant Avenue], joined by Defendants Rhoda Rochkind and Stanley Rochkind, joined by Defendants S & S Partnership and N.B.S., Inc., and opposed by Plaintiff, is **GRANTED** and the August 24, 2009 [Arc] Report relating to an exterior inspection of 2308 Bryant Avenue is **STRICKEN** and inadmissible as evidence in this case, and it is further

**ORDERED** that the Motion of Defendant Benjamin for Summary Judgment and to disregard an [Arc] Report dated August 27, 2009 [Linden Avenue], opposed by Plaintiff with an October 20, 2009 Affidavit of Howard M. Klein M.D., and the subject of Defendant's Reply, is **GRANTED** in substantial part and:

1. Count 6 of the Complaint alleging Defendant Benjamin's violation of the Consumer Protection Act is **DISMISSED.**

2. An August 27, 2009 [Arc] Report relating to an exterior inspection of 2238 Linden Avenue is **STRICKEN** and inadmissible as evidence in this case.[20]

3. An Affidavit of Howard M. Klein, M.D. dated October 20, 2009 and offered by Plaintiff for expert opinion of substantial factor causation of Plaintiff's lead exposure at 2238 Linden Avenue, is **STRICKEN** and inadmissible as evidence in this case.[21]

---

**20.** The court's footnote # 7 provided: "In addition to reasons stated on the record, it is apparent that Plaintiff did not make a written request to Defendant Benjamin for inspection or testing of the Linden Avenue premises, pursuant to Paragraph 2(c) of the Modified Scheduling Order; nor did Plaintiff arrange for such inspection more than four months prior to the close of discovery, or permit the defendants or their experts to attend the testing."

**21.** The court's footnote # 8 provided: "In addition to reasons stated on the record, the [Arc] report relating to an exterior inspection of the

It is further **ORDERED** that the Motion of Defendants Shpritz and S & S General Partnership for Summary Judgment, opposed by Plaintiff with [Arc] Report [Linden Avenue] dated August 27, 2009 and October 20, 2009 Affidavit of Howard M. Klein M.D. and the subject of Defendant'[s] Rely . . . , is **GRANTED** in substantial part and:

1. An August 27, 2009 [Arc] Report relating to an exterior inspection of 2238 Linden Avenue and offered by Plaintiff is **STRICKEN** and inadmissible as evidence in this case.

2. And Affidavit of Howard M. Klein, M.D. dated October 20, 2009 and offered by Plaintiff for expert opinion of substantial factor causation of Plaintiff's lead exposure at 2238 Linden Avenue between August 7, 1987 and September 18, 1987 is **STRICKEN** and inadmissible as evidence in this case.

3. Defendants Shpritz and S & S General Partnership are entitled to judgment as a matter of law and are **DISMISSED** from this action.[22]

It is further **ORDERED** that the Motion of Defendants Stanley Rochkind and Rhoda Rochkind for Summary Judgment, opposed by Plaintiff and the subject of Defendants' Reply is **DENIED** as to claims of negligence (violation of Baltimore City Housing Code) by Defendants Dear Management and/or Stanley Rochkind and **GRANTED** as to all

---

Linden Avenue address is not data of a type reasonably relied upon by Dr. Klein in forming opinions or inferences on the existence of lead hazards in an interior apartment more than twenty years ago. Maryland Rule [5]–703."

22. The court's footnote # 10 provided: "Applying Maryland Rule 2–501 after striking the Klein Affidavit and the [Arc] Report, after reviewing the remaining facts of lead exposure offered by Plaintiff and all inferences in the light most favorable to Plaintiff, the [c]ourt has determined that there is no genuine dispute as to any material fact, that there is no offer of proof of substantial factor causation with respect to the Plaintiff's alleged exposure to lead hazards at 2238 Linden Avenue between August 7, 1987 and September 18, 1987, and that Plaintiff has offered just a scintilla of evidence insufficient to avoid summary judgment."

remaining claims against Rhoda Rochkind and Stanley Rochkind. . . .

\* \* \*

It is further **ORDERED** that the Motion of Defendants S & S Partnership and N.B.S., Inc. to Exclude the Affidavit or Testimony of Dr. Klein [Bryant Avenue] [23], Capillector Screening Tests, [Arc] Report [Bryant Avenue] and for Summary Judgment, opposed by Plaintiff [24] and the subject of Defendants' Reply . . ., is **GRANTED** in part and **DENIED** in part and:

1. An August 24, 2009 [Arc] Report relating to an exterior inspection of 2308 Bryant Avenue and offered by Plaintiff is **STRICKEN** and inadmissible as evidence in this case.

2. An Affidavit of Howard M. Klein, M.D. dated October 26, 2009 and offered by Plaintiff for expert opinion of substantial factor causation of Plaintiff's lead exposure at 2308 Bryant Avenue in and following 1988 is **STRICKEN** and inadmissible as evidence in this case.[25]

3. The Defendants' ensuing Motion for Summary Judgment is **DENIED,** however, Defendants are without prej-

---

**23.** The court's footnote # 12 provided: "Neither Plaintiff's Interrogatory answers disclosing experts . . . nor Plaintiff's letter disclosure of experts dated July 2, 2009 . . . provide any opinion or factual basis for such opinion by Dr. Klein relevant to Plaintiff's residency at the Bryant address."

**24.** The court's footnote # 13 provided: "Plaintiff's Opposition with Exhibits . . . included an Affidavit of Dr. Klein dated October 26, 2009 . . . offering his expert opinion, for the first time, that Plaintiff's exposure to lead hazards at the Bryant address was a substantial contributing factor to Plaintiff's injury, relying, inter alia, on two capillary test results and an FEP test in 1988 and 1990, certain lead abatement records at the Bryant address from 1979 . . ., and an [Arc] Report dated August 24, 2009 addressing the exterior of the Bryant address. . . ."

**25.** The court's footnote # 14 provided: "In addition to reasons stated on the record, the [Arc] report relating to an exterior inspection of the Bryant Avenue address is not data of a type reasonably relied upon by Dr. Klein in forming opinions or inferences on the existence of lead hazards in an interior apartment more than twenty years ago. Maryland Rule [5]–703."

udice to renew or restate their Motion in Limine or for Judgment consequent to the admissibility or inadmissibility of capillary testing evidence.[26]

It is further **ORDERED** that the Motion of Defendants ... S & S partnership and N.B.S., Inc. for Partial Summary Judgment, joined by Defendants Rhoda Rochkind and Stanely Rochkind ... and opposed by Plaintiff ...., is **GRANTED** and claims alleging violations of the Consumer Protection Act by Defendants in respect of Bryant Avenue ... are **DISMISSED.**

### E. *Subsequent Motions*

Following the court's November 12, 2009 order, several additional motions were filed and considered, including:

(a) [Appellee] S & S Partnership['s] Motion for Reconsideration of [S & S's] Motion for Summary Judgment ..., opposed by [appellant] and the subject of [appellee's] Reply; (b) [Appellee's] Barbara Benjamin Motion for Reconsideration ..., opposed by [appellant] and the subject of [Benjamin's] Reply; (c) [Appellees] Stanley Rochkind and Rhoda Rochkind Motion for Reconsideration ..., opposed by [appellant]; and [ (d) ] [appellant's] Counter–Motion for Reconsideration ..., opposed by [appellees] S & S Partnership and Barbara Benjamin in their replies.

In their motion for reconsideration, the Rochkinds argued that because the court struck the affidavit of Dr. Klein and the Arc report relating to Bryant Avenue, and ruled that appellant had failed to present a *prima facie* case of causation with respect to Bryant Avenue, appellant could not establish any claim against any party involved or associated with that property. The Rochkinds noted that they had joined in S &

---

**26.** The court's footnote # 15 provided: "Nor does this [c]ourt make any express finding as to the sufficiency of evidence of thirty year old abatement records or inferences of the ages of the residences on Linden or Bryant Avenues. Because the two [Arc] Reports and the two Klein Affidavits are excluded from evidence, the [c]ourt is not addressing whether other documents or information noted in those Affidavits are otherwise admissible."

S's motion for summary judgment, and that their only liability derived from their status as owner of the property by virtue of being partners in S & S.

In his motion for reconsideration, appellant argued that no appellee had "filed a motion to strike experts, or even raised any discovery issue," regarding Dr. Klein's expert opinions; thus, that the court had "actually conducted a hearing on a non-existent Motion to Strike the Expert Opinions of Dr. Klein," and *sua sponte* "decided issues that no party had raised," imposing "discovery sanctions where none had been requested."

After considering the foregoing, the court issued a modified order on December 28, 2009. The court granted appellees S & S and Benjamin's motions for reconsideration, and dismissed them from the case; denied appellant's counter-motion for reconsideration; and, denied the Rochkinds' motion, "without prejudice to pursue a Motion for Summary Judgment or Motion in Limine to challenge evidence supporting any claim in negligence against" them.

Subsequently, on or about February 1, 2010, the Rochkinds filed a motion for summary judgment, which was opposed. The court denied the motion without a hearing. As the trial date approached, the Rochkinds filed various motions in limine, including an October 18, 2010 "Motion In Limine to Preclude Plaintiff from Suggesting or Arguing that Lead Based Paint Was Present at Any Location in 2308 Bryant Avenue and to (1) Exclude the [Arc] Environment Report for 2308 Bryant Avenue and (2) Exclude any Testimony or Opinion of Dr. Klein." On or about February 11, 2011, the Rochkinds, joined by N.B.S., Dear Management, and Runkles, also filed a motion for summary judgment. Appellant filed an opposition, acknowledging that "because of prior erroneous rulings ... that resulted from an abuse of [the court's] discretion, [he was] now in the position of being unable to make a *prima facie* case [of negligence]," but reserving the right to argue the court's abuse of discretion on appeal. The

court granted the Rochkinds' motion on April 1, 2011, and this appeal followed.

## Discussion

### 1. *Standards of Review*

Maryland law is well settled regarding the appellate standards to be applied in reviewing a grant of summary judgment. The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal. *Livesay v. Baltimore County*, 384 Md. 1, 9, 862 A.2d 33 (2004). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the party in whose favor judgment is entered is entitled to judgment as a matter of law. Maryland Rule 2–501(f). In granting or denying a motion for summary judgment, a judge makes no findings of fact. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). The appellate court will review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520 (2006). In reviewing a grant of summary judgment under Maryland Rule 2–501, we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Wells Fargo Home Mortgage, Inc. v. Neal*, 398 Md. 705, 714, 922 A.2d 538 (2007) (quoting *Livesay*, 384 Md. at 9–10, 862 A.2d 33).

 Under general principles, the determination as to when discovery should be concluded ordinarily rests in the exercise of the sound discretion of the trial court. *Lowery v. Smithsburg Emergency Med. Serv.*, 173 Md.App. 662, 678, 920 A.2d 546 (2007). The admission or exclusion of evidence, *see Bern–Shaw Ltd. P'ship v. Mayor & City Council*, 377 Md. 277, 291, 833 A.2d 502 (2003), as well as the "admissibility of expert testimony [are also] within the sound discretion of the trial judge and will not be disturbed on appeal unless clearly

erroneous." *Wilson v. State,* 370 Md. 191, 200, 803 A.2d 1034 (2002).

With regard to scheduling orders and sanctions for violations of scheduling orders, in *Livingstone v. Greater Washington Anesthesiology & Pain Consultants,* 187 Md.App. 346, 978 A.2d 852 (2009), we explained,

"[t]he principal function of a scheduling order is to move the case efficiently through the litigation process by setting specific dates or time limits for anticipated litigation events to occur." *Dorsey v. Nold,* 362 Md. 241, 255 [765 A.2d 79] (2001). In *Helman v. Mendelson,* 138 Md.App. 29, 47 [769 A.2d 1025] *cert. denied,* 365 Md. 66 [775 A.2d 1216] (2001), this Court stated that "good faith compliance with scheduling orders is important to the administration of the judicial system and providing all litigants with fair and timely resolution of court disputes." A scheduling order does not "enlarge or constrict the scope of discovery," but rather, it sets "time limits on certain discovery events." *Rodriguez v. Clarke,* 400 Md. 39, 60 [926 A.2d 736] (2007) (citation omitted).

With respect to sanctions for violation of a scheduling order, the Court of Appeals has explained:

Just as there are sanctions for the violation of discovery rules, sanctions are available for the violation of directives and scheduling orders, although they are not specified in any rule.... Apart from any actual prejudice that may be suffered by the party in not receiving the information in a timely fashion, or that may be suffered by the court if trial has to be postponed, the court is demeaned by noncompliance with its order.

*Dorsey,* 362 Md. at 256–57 [765 A.2d 79].

This Court has upheld a trial court's ruling excluding expert testimony when the expert was not identified until after the deadline set in the scheduling order. *See Shelton v. Kirson,* 119 Md.App. 325, 332 [705 A.2d 25] (no abuse of discretion in excluding testimony of expert designated 12 months after the deadline), *cert. denied,* 349 Md. 236 [707 A.2d 1329]

(1998). *See also Naughton v. Bankier*, 114 Md.App. 641, 653 [691 A.2d 712] (1997) (abuse of discretion to allow expert witness to testify when not identified until one year past the deadline and one business day before trial).

In looking at the propriety of a sanction for a violation of a scheduling order, the reasons given for noncompliance, and the need for an exemption from the time deadlines imposed, are significant. In *Maddox v. Stone*, this Court stated: " '[W]hile absolute compliance with scheduling orders is not always feasible from a practical standpoint, we think it quite reasonable for Maryland courts to demand at least substantial compliance, or, *at the barest minimum*, a good faith and earnest effort toward compliance.' " 174 Md.App. 489, 499 [921 A.2d 912] (2007) (quoting *Naughton*, 114 Md.App. at 653 [691 A.2d 712] ). A party's "good faith substantial compliance with a scheduling order is ordinarily sufficient to forestay" the exclusion of "a key witness because of a party's failure to meet the deadlines in its scheduling order." *Id.* at 501 [921 A.2d 912]. Ultimately, however, " 'the appropriate sanction for a discovery or scheduling order violation is largely discretionary with the trial court.' " *Id.* (quoting *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 545 [745 A.2d 1026] (2000)).

A trial court's discretionary rulings will be disturbed only upon a finding of an abuse of discretion. *Wilson v. Crane*, 385 Md. 185, 199 [867 A.2d 1077] (2005). "[A]n abuse of discretion should only be found in the extraordinary, exceptional, or most egregious case." *Id.* This standard has been summarized as follows:

"There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court [ ]' ... or when the court acts 'without reference to any guiding principles.' An abuse of discretion may also be found where the ruling under consideration is 'clearly against logic and effect of facts and inferences before the court [ ]' ... or when the ruling is 'violative of fact and logic.' "

"Questions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred.' In sum, to be reversed 'the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' "

*Id.* at 198–99 [978 A.2d 852] (quoting *In re: Adoption/Guardianship No. 3598,* 347 Md. 295, 312–13 [701 A.2d 110] (1997)) (other internal citations omitted).

*Livingstone,* 187 Md.App. at 387–89 [978 A.2d 852] (parallel citations omitted).

### 2. *Merits*

As noted above, appellant raises several questions for our review on this appeal. We will discuss each in turn noting, however, that as the issue of the Dr. Klein affidavit relates to all parties, we will discuss it separately.

█ First, appellant argues that the court erred and/or abused its discretion in granting N.B.S.'s motion for summary judgment. According to appellant, the court's denial of his request to depose Stanley Rochkind, pursuant to Maryland Rule 2-501(d),[27] after N.B.S. included Rochkind's affidavit as an attachment in support of its amended motion for summary judgment, was an abuse of discretion. According to appellant, the deposition of Rochkind was "required so that information concerning [his] involvement with N.B.S., Inc. and S & S Partnership and the details surrounding the execution of an

---

**27.** That Rule provides:

> If the court is satisfied from the affidavit of a party opposing a motion for summary judgment that the facts essential to justify the opposition cannot be set forth for reasons stated in the affidavit, the court may deny the motion or may order a continuance to permit affidavits to be obtained or discovery to be conducted or may enter any other order that justice requires.

Indemnity Deed of Trust with regard to the Bryant Avenue property could be obtained."

Appellant also argues that the court erred and/or abused its discretion when it failed to "correctly apply the applicable law regarding the definition of 'owner' as that term is defined by the Baltimore City Housing Code." Appellant's theory, advanced both at the motions hearing and on appeal, is that because N.B.S. "borrowed in excess of two million dollars from a local bank and S & S Partnership ... guaranteed this loan, securing the guarantee by granting an Indemnity Deed of Trust in the Bryant Avenue property[,]" and " 'due to the closely related nature of [Rochkind, N.B.S., and S & S], with [Rochkind] having partnership interests in each entity, there is evidence from which a fact finder can conclude that [N.B.S.] has an ownership interest in the subject property, pursuant to the Baltimore City Housing Code's definition of 'owner,' because [N.B.S.'s] actions (whether or not it defaults upon the loan), have an effect on control and ownership of the property."

We agree with the motions court that the evidence and theory advanced by appellant based on the indemnity deed of trust does not meet the definition of owner within the meaning of the housing code. Thus, there was no reasonable basis on which to believe that the deposition of Stanley Rochkind would produce anything relevant.

Pursuant to § 105 of the housing code, an "owner" is

any person, firm, corporation, guardian, conservator, receiver, trustee, executor, or other judicial officer, who, alone or jointly or severally with others, owns, holds, or controls the whole, or any part, of the freehold or leasehold title to any dwelling or dwelling unit, with or without accompanying actual possession thereof, and shall include in addition to the holder of legal title, any vendee in possession thereof, but shall not include a mortgagee or an owner of a reversionary interest under a ground rent lease.

Appellant does not dispute that N.B.S. was never an "owner" of the property in the traditional sense, or that S & S had

title to the Bryant Avenue property during his tenancy. Rather, appellant's theory is that because N.B.S. acquired a loan, for which the property was offered by S & S as security, that is somehow equivalent to "ownership." Appellant also argues that the court based its ruling on the ground that the time for discovery had expired and ignored the provisions contained in Rule 2–501(d).

██ We, like the circuit court, can find no authority to support appellant's position on ownership. Thus, the "details surrounding the execution of" the deed of trust would not change the fact that the issuance of such a deed does not transfer ownership or control of property to a borrower. Moreover, there was no evidence in the record to support a contention that N.B.S. managed the day-to-day affairs of the property owned by S & S, or that N.B.S. was in any way responsible for, or had knowledge of, the maintenance or leasing of the property. Rule 2–501(d) does not contain an entitlement to discovery. A court has the discretionary right to grant a continuance to obtain discovery, and it will be reviewed for abuse. *Chaires v. Chevy Chase Bank,* 131 Md. App. 64, 88, 748 A.2d 34 (2000). The timing and nature of any request under Rule 2–501(d), and the likelihood of obtaining relevant information, along with all other relevant circumstances will be taken into consideration in determining whether a trial court abused its discretion. We find no abuse in this instance. Given appellant's theory of ownership, there is no reasonable basis for requiring the court to grant further discovery.

██ Appellant next argues that the court erred and/or abused its discretion when it granted the motion to strike the Arc report relating to Bryant Avenue filed by Runkles and joined by the Rochkinds, S & S and N.B.S. According to appellant, he was "deprived . . . of notice and the opportunity to be heard" when the trial court "on its own initiative," questioned appellant on his adherence to Maryland Rule 2–402(g)(1), and relied on that rule "as the basis for its decisions," although no such motion was before the court. Appel-

lant also asserts that the court erred in deciding the merits of the motion to strike because the scheduling order concerned "Defendants who still own a subject property," and it was undisputed that "none of the [a]ppellees owned the Bryant Avenue property at the time of the testing"; thus, "they were not entitled to notice or opportunity to attend," and there was no scheduling order violation.

At issue is the following paragraph from the scheduling order:

(c) Defendants who still own a subject property shall allow the Plaintiffs to perform a non-destructive lead test upon the premises within 60 days of a written request provided that the request i[s] made no later than four months prior to the discovery deadline in paragraph 2(a). The defendants shall be permitted to attend the lead test accompanied by a consultant(s) or expert(s).

Instead of giving any appellee notice and an opportunity to attend the lead assessment testing by Arc, appellant had the testing done a few days before the close of extended discovery. Appellant asserted and asserts that his position is the correct one, and that he was not required to give notice to anyone because none of the appellees still owned the property. The court ruled:

The [Arc] reports are going to be excluded as to both Linden Avenue and the Bryant Avenue addresses as too late to do anybody any good, reflecting no good faith compliance with the scheduling order; no notice to the [appellees] to attend, participate, and afford their experts any realistic opportunity to address and respond to the [Arc] reports.

According to the court, the scheduling order was "clear enough." We agree. Appellant was required by the plain language of the scheduling order to permit the defendants to attend the lead test accompanied by a consultant or expert. Appellant did not do so. The court was within its discretion to fashion an appropriate remedy for appellant's violation. The remedy, i.e., excluding the reports, was not excessive and we

will not disturb the court's ruling. As a result of that conclusion, there is no need to address the court's reference to lack of adequacy of disclosure under Rule 2–402(g)(1) as additional grounds for the court's decision.

■ Appellant next argues that the court erred and/or abused its discretion when it granted Benjamin's motion for summary judgment and ordered that the Arc report relating to Linden Avenue be stricken and inadmissible. Appellant argues that the court should have stricken Benjamin's reply to appellant's response and then treated Benjamin's motion, which did not contain attachments, as a motion to dismiss and not a motion for summary judgment.[28] Appellant also argues that the court erred in *sua sponte* considering the timeliness and adequacy of appellant's disclosures, in not considering whether appellant was entitled to discovery of the new experts identified by Benjamin, and in opining that the report was not the type that Dr. Klein could rely on.

Preliminarily, we note that while Benjamin is no longer an appellee on this appeal, her motion for summary judgment raised the argument that the Arc report pertaining to Linden Avenue violated the scheduling order. Thus, that issue was properly before the court and appellant was on notice that the issue would be before the court. For the reasons set forth above, we uphold the striking of the report as to all appellees, including Shpritz and S & S G.P., because the court did not err in concluding that it was clearly in violation of the scheduling order. As a result of that conclusion, there is no need to address the court's alternative grounds.

Appellant next argues that the court erred and/or abused its discretion when it granted Shpritz and S & S G.P.'s motion for summary judgment. Appellant takes issue with the court's ruling that there was insufficient proof of exposure at Linden Avenue between August 7, 1987 and September 18, 1987, the time period during which S & S G.P. owned the property.

---

28. We note that appellant's response did contain matters outside of the record..

Appellant's primary argument is that the court erred in its ruling on the Arc report and the Klein affidavit.

We have already concluded that the court did not abuse its discretion when it struck the Arc report relating to Linden Avenue. As we shall discuss, *infra*, we conclude that the court did not err in striking the affidavit of Dr. Klein. Appellant produced no evidence that the third floor interior of Linden Avenue contained lead paint during the brief period that S & S G.P. owned the property during appellant's tenancy. Moreover, appellant was not tested for lead exposure until after S & S G.P. sold the property to Benjamin. In fact, appellant's first lead level was reported nearly two months after the property was sold. Thus, in the absence of any evidence to suggest that appellant was injured due to exposure to lead between August 7, 1987 and September 18, 1987, appellant could not create a genuine dispute of fact.

■ Appellant next argues that the court erred and/or abused its discretion when it granted N.B.S. and S & S's motion for partial summary judgment as to his CPA claims. According to appellant, the court made "two fatal mistakes." "First, it assumed that proof of the ... existence of chipping, peeling and/or flaking paint at the inception of the lease is [the] only means by which a Plaintiff can successfully prove a CPA claim in a lead-paint case," and "[s]econd, it improperly made judgments of credibility and declared that it was 'unimpressed' with [a]ppellant's evidence of a CPA violation." Again, we disagree with appellant.

The purpose of the CPA is to protect consumers from unfair or deceptive trade practices that induces prospective tenants to enter into a lease. Maryland Code (2005 Repl. Vol.), § 13–303(1) of the Commercial Law Article. *See Richwind Joint Venture v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994). The court held, and appellant concedes, that there was no evidence of deteriorated paint at the inception of the lease at Bryant Avenue. Appellant asserts, however, that based on his own answers to interrogatories, which were attached to his response to appellees' motion, appellees negligently repaired and

painted the premises prior to the inception of the lease, "painting over old paint without properly preparing the surfaces as required" in violation of § 703 of the Baltimore City Housing Code, which provides that "[a]ll interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition"; thus, because there was evidence to prove a violation of the housing code at the inception of the lease, "it follows that [a]ppellant ... alleged sufficient facts to prove his CPA claim. Appellant points out that the court was "unimpressed" with his interrogatory answer, and the court was not permitted to make that judgment of credibility.

Even accepting appellant's interrogatory answer in the light most favorable to him, we perceive no error, and disagree that the court made a credibility determination. The undisputed facts in the record indicate that the walls were painted and repaired and there was no peeling or flaking paint at the time appellant entered into the lease and moved into the property. Crosby herself testified that she did not see any flaking or peeling paint when she inspected the property before entering into the lease. The personal knowledge of appellant and Crosby was limited to what they observed, i.e., no flaking or peeling paint. They had no knowledge relating to how the surface had been prepared. There was simply no admissible evidence to support a CPA claim against appellees.

■ As discussed above, one of appellant's primary arguments on appeal, relating to all appellees, is that the court raised issues *sua sponte*, not raised by the appellees in their motions, and ruled on them.

As we have observed, with respect to the Arc reports, there was no need to address this issue as the question of lack of notice and opportunity to be present at any inspection was raised by motion. With respect to Dr. Klein, appellant asserts that no appellee sought to strike Dr. Klein's affidavit based on the timeliness or sufficiency of appellant's expert designations. Rather, appellees argued that Dr. Klein's opinions were not supported by the evidence.

We do not disagree with appellant that appellees did not challenge the timeliness or sufficiency of his expert designation. We observe, however, that relevant to the problem area is that appellant moved to strike appellees's replies and attachments. This necessarily raised the issues pertaining to the Dr. Klein affidavits. The court noted that striking the replies would be unfair in light of appellant's noncompliance with the scheduling order and disclosure of his expert's theory at the 11th hour. Appellant certainly cannot fail to disclose, reveal his expert's opinions at the 11th hour, and then prevent defendants from responding on the ground that they are too late. One possible remedy was to continue and enter another scheduling order with a new trial date. The court was not, as a matter of law, required to do that. Another possible remedy was to rule on whether Dr. Klein had a sufficient factual basis to opine, without the Arc reports, and either hold that he did not or that he did. If the holding were that he did not, then the testimony would have been inadmissible. If the holding were that he did, then the identification of witnesses by all defendants would stand, including those identified in the replies. The case would have continued to trial but without discovery of any of those experts because the trial date was in January, and discovery had closed.

Another option was to exclude Dr. Klein, which is what the trial court did. A court has the right to enforce it own orders, including scheduling orders, to control its docket and, in appropriate circumstances, may raise compliance issues *sua sponte*. At the same time, parties are entitled to appropriate notice and opportunity to be heard. Here, it was clear prior to the hearing before the court that, through replies, appellees asserted that they had just received information that necessitated the filing of replies and naming of new experts. Appellant challenged the replies as untimely. When the court inquired of appellant as to the facts surrounding the timing and adequacy of his disclosure, appellant's counsel responded that appellees had not raised the issue of appellant's violation of the scheduling order; rather they sought to justify their replies. In the context of appellant's own motion to strike

appellees's replies, the court was entitled to raise the issue of appellant's compliance with the scheduling order because of appellees' assertion that the reason for their replies was the late information supplied by appellant. Appellant makes no showing of any prejudice resulting from any inability to prepare. Appellant does not challenge the accuracy of facts relating to when his disclosures were made or the substance of such disclosures. Consequently, we perceive no reversible error.

Any remaining issues, including appellant's contention that the court erred and/or abused its discretion in granting the Rochkinds' "clean up" motion for summary judgment, joined by N.B.S., Dear Management and Runkles, necessarily fail because of our conclusion that the court did not abuse its discretion in excluding either of the Arc reports or in excluding Dr. Klein's affidavit. In the absence of evidence to make a *prima facie* case of negligence, the court's granting of the motions for summary judgment was proper.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**